# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 15 2018, 9:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John S. Capper, IV
Capper Tulley & Reimondo
Crawfordsville, Indiana

ATTORNEY FOR APPELLEE

Kyle D. Gobel
Collier Gobel Homann, LLC
Crawfordsville, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Andrew Haniford,

*Appellant-Petitioner*,

v.

Chelsy Lawrence,

*Appellee-Respondent*.

March 15, 2018

Court of Appeals Case No.
54A01-1709-JP-2161

Appeal from the Montgomery
Circuit Court

The Honorable Harry A. Siamas,
Judge

Trial Court Cause No.
54C01-1507-JP-153

**Brown, Judge.**

[1] Andrew Haniford ("Father") appeals the trial court's denial of his petition to modify child custody. Father raises one issue which we revise and restate as whether the trial court erred in denying his petition to modify custody. We affirm.

*Facts and Procedural History*

[2] On August 20, 2015, the court approved an agreed entry finding that Chelsy Lawrence ("Mother") and Father were the biological parents of M.H., born on January 15, 2015, that Mother would have sole legal custody of M.H., and that Father would have parenting time pursuant to the Indiana Parenting Time Guidelines.

[3] On October 12, 2016, the Department of Child Services ("DCS") filed a verified petition in the Montgomery Circuit Court alleging M.H. to be a child in need of services ("CHINS") and that Mother was using heroin while in a sole caregiver role to M.H.. The Petition alleged that Mother admitted on September 20, 2016, to previous drug use, she refused a drug screen, law enforcement searched the home on October 11, 2016, and found paraphernalia, including a used syringe in a drawer easily accessible to a toddler, M.H. had been removed from the home with the assistance of law enforcement, and DCS had not located Father.

[4] On March 24, 2017, Father filed a verified petition to modify custody in the Montgomery Circuit Court based upon Mother's lifestyle and arrest, the CHINS action, and the placement of M.H. with Father.

[5] On August 9, 2017, the court entered an Order Approving Permanency Plan in the CHINS action, finding that it was most appropriate and consistent with the best interests of M.H. to be returned to or continued in the custodial care of Mother.

[6] The same day, the court held a hearing on Father's petition.[1] Danielle Jeanette Long, a registered nurse and Father's half-sister, testified that M.H. was placed in her care on October 25, 2016 and was placed with Father on February 7, 2017. She stated that she had concerns with Mother's ability to care for him including Mother's tendency to not pay attention to M.H. after an hour or two of visitation and her inability to handle M.H. during his meltdowns. She testified that she had concerns about Mother's care, that there were diaper rash issues when Mother had unsupervised visits, and that M.H. "would come home with severe flaming red diaper rash." Transcript Volume II at 9. She described Father as extremely interactive with M.H. and stated that M.H. had adjusted very well to living with Father, his fiancée, and the fiancée's three children. On cross-examination, Long indicated that Father did not have contact with M.H. from his birth to October 2017, that Father has three children older than M.H., and that one of those children was in the care of Father's sister.

[7] Mandy Fruits, Father's fiancée, testified that she began her relationship with Father in November 2015, she has three children, Father was a "very good

---

[1] Judge Harry Siamas signed the August 9, 2017 Order Approving Permanency Plan and also conducted the hearing on Father's petition to modify custody.

dad," M.H. adjusted to her children, and M.H. loved Father the "very first moment he saw him." *Id.* at 21. She testified that M.H. would come home with severe diaper rash following visitation with Mother, that Father had a structure in the house regarding bedtimes, eating, and naptime and that M.H. adjusted well to the structure, and they moved to a four-bedroom house on three acres. On cross-examination, Fruits testified that M.H. was not in Father's home from November 2015 to November 2016 and that there were times when Father's older children visited the house resulting in seven children being there.

[8] Father testified that he did not receive visitation with M.H. after the August 2015 order because Mother refused visitation, that he began visiting with M.H. when DCS became involved, and that he completed everything DCS asked him to complete. He testified that M.H. was placed with him in February 2017 and that it had been only a few days since M.H. was returned to Mother's care through the CHINS action. He stated that he has visitation with one of his other children and pays forty dollars a week in support for that child, and that M.H. has "done really good with" the other children in the house. *Id.* at 33.

[9] On cross-examination, Father clarified that he obtained custody of one of his other children and that child lives with Father's sister. He responded that his other two children were in the care of their mothers but that he had parenting time with the three children. He testified that his relationship with Mother fell apart after M.H.'s birth and that he saw M.H. a handful of times between his birth in January 2015 and DCS becoming involved in October 2016. When

asked if it was accurate to say that he saw M.H. less than ten times in that "two year or so stretch," Father answered: "It was probably about ten times." *Id.* at 39.

[10] Mother testified that she did not try to keep M.H. from Father following M.H.'s birth and that Father saw M.H. about three times prior to the end of their relationship in April 2015. She stated that she had no contact with Father between December 31, 2015, and October 2016, and that she lived in the same place and had the same phone number during that time. She testified that she reached out to Father to see if he could help with diapers or Tylenol, "but it was always no and it was never how's [M.H.] doing or can I see him or anything it was just that was the extent of the conversation after he said no." *Id.* at 45. She testified that she had concerns with Father's parenting time including that M.H.'s sleep schedule was off, he had quit taking naps and was up until midnight, M.H. told her that he would eat "always dry cereal or a Lunchables or it's never a meal," and that his fingernails and toenails always had dirt caked underneath them. *Id.* at 56. She also testified that M.H. had severe diaper rash with Father. She acknowledged that M.H. was injured in her care in August 2016 when she was throwing him in the air and catching him and he just slipped through her hands and fell onto the floor.

[11] According to Mother's testimony, she was twenty-nine years old and her first period of addiction was from age eighteen to twenty-three and that she was mostly addicted to pain medicine. She went to prison when she was twenty-three years old, was released in April 2013, maintained a period of sobriety, and

relapsed in September 2016 following a job loss and her car breaking down. She went to detox the last week of September and did not use drugs for a period of time, relapsed, and was arrested on October 11, 2016, for possession of a syringe. She was released from jail on November 12, 2016, and immediately began engaging in services through DCS. She last used controlled substances on December 7, 2016, she completed an inpatient rehab, continued with treatment following rehab, started relapse prevention and individual counseling, and maintained employment. Mother also testified that she received drug screens with DCS and her last positive screen was on November 29, 2016.

[12] Mother's mother, Dora Hardacker, testified that Mother, Mother's other child, and M.H. live with her. She testified that she called DCS in October 2016 because she felt Mother had relapsed and that if there is an issue she is straightforward. She stated that Mother can stay in her home as long as she needs to and she has plenty of room.

[13] The court took judicial notice of the CHINS action and its records and pleadings. A monthly progress report dated May 30, 2017, for Mother from Wabash Valley Alliance states: "When scheduled for therapy, [Mother] is an active participant in treatment, appears highly motivated to complete all DCS requirements and maintain sobriety in order to be reunited with her son. She is an active participant in relapse prevention group showing good insight into her sobriety and recovery." Appellee's Appendix Volume 2 at 28. A document from Wabash Valley Alliance dated May 31, 2017, indicates under the heading "Clinical Assessment" that Mother "does a good job in engaging [M.H.]. She

demonstrates good parenting skills with him." *Id.* at 55. A monthly progress report signed June 1, 2017, states:

> Presenting Issues: [Mother] continues to go through the process of having supervised visits with [M.H.]. She has had to demonstrate her parenting skills in situations where [M.H.] required some redirection or discipline. [Mother] has also had to show that she can care for [M.H.'s] well-being.

> Family Functional Strengths: [Mother] continues to demonstrate good parenting skills. She provides food for [M.H.] at the beginning of the visits, as he does not tend to eat breakfast before the visit. She engages him in age-appropriate play and will play age-appropriate cartoons on the TV. [Mother] has occasionally had to use discipline with [M.H.] by placing him in time out for no longer than 2 minutes. She makes sure that she talks to him after his time out in reminding him to listen or to not tell her no, but she also makes sure to cuddle him and reassure him of her affection after the time out is over. [Mother] has demonstrated that she can care for his well-being [and] is determined to show that she is a safe and appropriate caregiver for her children.

*Id.* at 37-38. A document titled Child and Family Team Meeting Notes dated July 5, 2017, states that M.H. was "conditionally safe at placement with" Father and that current safety concerns included: "[s]till reporting that 'daddy does it' with injuries," concerns about bedtime and M.H. going to bed late, "[s]till has a bit of a rash, possible allergy to Desitin," and "[s]tarting to say 'oh shit,' 'god', 'I'm gonna slap you' – discussed concerns about other children saying these things." *Id.* at 80. The document also states: Mother "is great at engaging in creative, imaginative play with [M.H.]. She is passionate about her role as a mother. [Mother] continues to push forward through barriers." *Id.* at

81. A document titled Child and Family Team Meeting Notes dated July 7, 2017, states that Father and his fiancée had addressed safety concerns in a timely manner and Father had completed the home-based services that DCS requested.

On August 18, 2017, the trial court denied Father's petition to modify custody.

### *Discussion*

The issue is whether the trial court erred in denying Father's petition to modify custody. Generally, we review custody modifications for an abuse of discretion and have a "preference for granting latitude and deference to our trial judges in family law matters." *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). "We set aside judgments only when they are clearly erroneous, and will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment." *Id.* The Indiana Supreme Court explained the reason for this deference in *Kirk*:

> While we are not able to say the trial judge could not have found otherwise than he did upon the evidence introduced below, this Court as a court of review has heretofore held by a long line of decisions that we are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did.

*Id.* (quoting *Brickley v. Brickley*, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)). Therefore, "[o]n appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Id.* "The party seeking to modify custody bears the burden of demonstrating the existing custody should be altered." *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016).

[16] Where, as here, the trial court did not make special findings, we review the trial court's decision as a general judgment and, without reweighing the evidence or considering witness credibility, affirm it if sustainable upon any theory consistent with the evidence. *Walker v. Nelson*, 911 N.E.2d 124, 127 (Ind. Ct. App. 2009) (citing *Baxendale v. Raich*, 878 N.E.2d 1252, 1257 (Ind. 2008)). Judgments in custody matters generally turn on essential factual determinations and will be set aside only when they are clearly erroneous. *Baxendale*, 878 N.E.2d at 1257. We will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. *Id.* at 1257-1258.

[17] The child custody modification statute provides that "[t]he court may not modify a child custody order unless: (1) modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under [Ind. Code § 31-14-13-2] . . . ." Ind. Code § 31-14-13-6. Ind. Code § 31-14-13-2 lists the following factors:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parents;

(B) the child's siblings; and

(C) any other person who may significantly affect the child's best interest.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

[18] Father argues that M.H.'s close bond with him and his family, M.H.'s adjustment to living with him, and Mother's substance abuse addiction are substantial changes to the initial paternity custody determination factors which warrant a modification of custody. He asserts that the best interests of M.H. would be served by modifying custody because he and his family have committed to providing M.H. with a stable home and care, while Mother has struggled with parenting skills and criminal behaviors.

[19] Mother argues that the court did not abuse its discretion and points out that Father had no or limited contact with M.H. for periods of time and has three older children of whom he does not have custody. She acknowledges that her substance abuse and arrest were significant causes of concern, but asserts she took all necessary steps to address her substance abuse and had been sober more

than seven months at the time of the modification hearing. She also points out that the CHINS court placed M.H. back in her care.

[20] The record reveals that, while Long testified that she was concerned with M.H.'s diaper rash issues when Mother had unsupervised visits, Mother testified that M.H. had severe diaper rash with Father. While a CHINS action was initiated, Father testified that M.H. was returned to Mother by the court through the CHINS action. Indeed, in its Order Approving Permanency Plan on August 9, 2017, the court found that it was most appropriate and consistent with the best interests of M.H. to be returned to or continued in the custodial care of Mother. Mother testified that she last used controlled substances on December 7, 2016, she completed an inpatient rehab, continued with treatment following rehab, started relapse prevention and individual counseling, and maintained employment. The court heard Mother's testimony regarding her concerns with Father's parenting. The court also heard the testimony of Mother's mother and was able to review the documents in the CHINS case. We conclude that Father asks that we reweigh the evidence and judge the credibility of the witnesses, which we cannot do. *See Fields v. Fields*, 749 N.E.2d 100, 108 (Ind. Ct. App. 2001), *trans. denied*. We will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. *Baxendale*, 878 N.E.2d at 1257-1258. We cannot say that the trial court's judgment was clearly erroneous.

## *Conclusion*

[21]     For the foregoing reasons, we affirm the trial court's denial of Father's petition to modify the custody of M.H.

[22]     Affirmed.

Baker, J., and Riley, J., concur.